AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| Disclosure of Location-Based Services for AT&T Cellular Telephone Number (202) 304-4414 | ) Case No. 1:17-sw-618 |
| | ) |
| | ) |

SEP 26 2017

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Facilities belonging to AT&T associated with cellular telephone number (202) 304-4414.  This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(a) and Fed. Rule of Crim. P. 41.

located in the _____Unknown_____ District of _____ , there is now concealed *(identify the person or describe the property to be seized):*
Disclosure of location-based electronic communications data for AT&T cellular telephone number (202) 304-4414.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | Conspiracy to distribute fentanyl, a Schedule II controlled substance, and heroin, a Schedule I controlled substance |

The application is based on these facts:
See attached affidavit of Donald August Mockenhaupt, FBI Special Agent.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Donald August Mockenhaupt, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____09/26/2017____

City and state: Alexandria, Virginia

/s/ _____
John F. Anderson
United States Magistrate Judge
*Judge's signature*

The Honorable John F. Anderson, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

SEP 2 6 2017

IN THE MATTER OF THE APPLICATION      )
OF THE UNITED STATES OF AMERICA        )
FOR A SEARCH WARRANT AND ORDERS        )      (Under Seal)
PURSUANT TO 18 U.S.C. §§ 2703(c)(1)(A) )
AND 3122(a)(1) FOR THE 1) DISCLOSURE   )      1:17-sw-618
OF LOCATION BASED SERVICES,            )
2) DISCLOSURE OF STORED                )
TELECOMMUNICATIONS RECORDS FOR         )
TELEPHONE NUMBER **(202) 304-4414**    )
AND 3) INSTALLATION OF A PEN           )
REGISTER AND TRAP AND TRACE DEVICE     )

AFFIDAVIT IN SUPPORT OF
A SEARCH WARRANT AND ORDER UNDER 18 U.S.C. § 2703(c)(1)(A)
AND AN ORDER UNDER 18 U.S.C. § 3122(a)(1)

I, Donald August Mockenhaupt, being duly sworn, depose and state as follows:

INTRODUCTION

1.      I have been employed as a Special Agent of the Federal Bureau of Investigation

(FBI) since February 2002.  I am currently assigned to Squad CR-7 in the Washington Field

Office, Northern Virginia Resident Agency, where I am tasked with investigating violent gangs,

narcotics trafficking, and other offenses.  During my tenure with the FBI, I have participated in

numerous investigations involving unlawful narcotics distribution.  During these investigations, I

have been involved in the application for and execution of many arrest and search warrants for

narcotics related offenses, resulting in the prosecution and conviction of numerous individuals

and the seizure of illegal drugs, weapons, illegal drug proceeds, and other evidence of criminal

activity.  As a narcotics investigator, I have interviewed many individuals involved in drug

trafficking and have obtained information from them regarding the acquisition, sale, importation,

manufacture, and distribution of controlled substances.  Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and users of controlled dangerous substances.

2.      This affidavit is submitted in support of an application for a search warrant, an order for the disclosure of location-based services and stored telecommunications records, and an order for the installation of a pen register and trap and trace device for the cellular telephone number **(202) 304-4414**, serviced by AT&T (as defined in the Application and herein as "SUBJECT TELEPHONE NUMBER"), pursuant to Federal Rule of Criminal Procedure 41(d)(1) and Title 18, United States Code, Sections 2703(c) and 3122(a).  For the reasons described herein, there is probable cause to believe that the SUBJECT TELEPHONE NUMBER is being used by Donnell Leroy WILLIAMS in connection with and to further a conspiracy to distribute fentanyl, a Schedule II controlled substance, and heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.  The facts further demonstrate sufficient grounds to believe the disclosure of location-based services and the disclosure of stored telecommunications records, as well as the installation of a pen register and trap and trace device on the SUBJECT TELEPHONE NUMBER, will be relevant and material to an ongoing criminal investigation.

3.      This affidavit does not contain every fact known to me regarding this investigation, but rather contains information necessary to demonstrate probable cause in support of the above-referenced search warrant and orders.  All observations referenced in this affidavit that were not personally made by me were relayed to me by the person(s) who made such observations or in reports that detailed the events described by that person(s).

2

PROBABLE CAUSE

4.     In 2017, the Fairfax County Police Department's (FCPD) Narcotics Unit obtained information from a confidential source ("CS") that VICTORIA MICHELLE JOVINELLY resided in Washington, D.C., and that she used and distributed heroin.

5.     On May 9, 2016, an FCPD detective operating in an undercover capacity ("UC") traveled with the CS to meet JOVINELLY for the purpose of buying one gram of heroin. The UC was outfitted with an audio/video recording device. Shortly after JOVINELLY entered the UC's vehicle in Washington, D.C., she informed the UC and the CS that they would have to travel to Maryland to obtain the heroin. They drove to a parking lot in Hyattsville, Maryland, where JOVINELLY exited the UC's vehicle with $120 in official government funds. JOVINELLY was observed entering a vehicle operated by an individual who was subsequently identified as WILLIAMS. She returned to the UC's vehicle shortly thereafter with the suspected heroin, and she gave it to the UC. JOVINELLY provided WILLIAMS' telephone number to the CS while they were in the vehicle, and the CS then provided it to the UC so that the UC could contact WILLIAMS directly for future transactions. The UC, CS, and JOVINELLY then returned to Washington, D.C., where JOVINELLY and the CS exited the vehicle. The suspected heroin was subsequently analyzed by the DEA Laboratory and was found to contain fentanyl, but not heroin.

6.     On May 17 and 18, 2017, the UC arranged to purchase one gram of heroin from WILLIAMS by contacting WILLIAMS on the SUBJECT TELEPHONE NUMBER. On May 18, 2017, the UC purchased approximately one gram of suspected heroin from WILLIAMS at a location in Hyattsville, Maryland, in exchange for $120 dollars in official government funds.

The transaction was audio/video recorded. The suspected heroin was subsequently analyzed by the DEA Laboratory and was found to contain fentanyl, but not heroin.

7.     On May 23 and 24, 2017, the UC arranged to purchase two grams of heroin from WILLIAMS by contacting WILLIAMS on the SUBJECT TELEPHONE NUMBER. On May 24, 2017, the UC purchased approximately two grams of suspected heroin from WILLIAMS at a location in Hyattsville, Maryland, in exchange for $240 dollars in official government funds. The transaction was audio/video recorded. The suspected heroin was subsequently analyzed by the DEA Laboratory and was found to contain fentanyl, but not heroin.   During the transaction on May 24, the UC asked WILLIAMS about a larger, future purchase, and WILLIAMS told the UC that he would sell 14 grams for $1,500 dollars.

8.     On June 7 and 9, 2017, the UC arranged to purchase 14 grams of heroin from WILLIAMS by contacting WILLIAMS on the SUBJECT TELEPHONE NUMBER. On June 9, 2017, the UC purchased approximately 14 grams of suspected heroin from WILLIAMS at a location in Hyattsville, Maryland, in exchange for $1,500 in official government funds. The transaction was audio/video recorded. During the transaction, WILLIAMS told the UC that he had a customer in Virginia who bought 25 grams at a time. WILLIAMS also informed the UC that he would sell 15 grams for $1,500 to the UC for the next deal. The suspected heroin was subsequently analyzed by the DEA Laboratory. It weighed approximately 13.8 grams, and it was found to contain fentanyl but not heroin.

9.     On June 20 and 22, 2017, the UC arranged to purchase 15 grams of heroin from WILLIAMS by contacting WILLIAMS on the SUBJECT TELEPHONE NUMBER. During a recorded telephone call over the SUBJECT TELEPHONE NUMBER, WILLIAMS informed the

UC that he had the "gray," not the "white," but it was still good. On June 22, 2017, the UC purchased approximately 15 grams of suspected heroin from WILLIAMS at a location in Arlington, Virginia, within the Eastern District of Virginia, in exchange for $1,500 dollars in official government funds. The transaction as audio/video recorded. During the transaction, WILLIAMS told the UC that the "white" was a "10," and the substance he just sold the UC was an "8½." WILLIAMS also told the UC that sometimes he obtained a kilogram at a time, and he quoted prices to the UC for purchases in 50 and 100 gram quantities. The suspected heroin was subsequently analyzed by the DEA Laboratory. It weighed approximately 14.8 grams, and it was found to contain heroin.

10.     Neither WILLIAMS nor the UC used the words "heroin" or "fentanyl" when discussing narcotics. For the deal on June 22, 2017, WILLIAMS made it known to the UC that he did not have any "white" available, but he had something else, which he called "gray." Based on WILLIAMS' comments and the lab reports from the controlled buys, I believe that WILLIAMS refers to fentanyl as "white." After the June 22 transaction, the UC made it known to WILLIAMS that he wanted to purchase the "white," and not the other substance, because that is what his "customers" liked. For the deals after June 22, the UC has not specifically requested fentanyl or "white" for every deal, but he has communicated to WILLIAMS that he only wants to buy the "white."

11.     On July 7, 2017, the Honorable Theresa Carroll Buchanan issued a search warrant and Court Orders for the (1) disclosure of location based services, (2) disclosure of stored telecommunications records, and (3) the installation of a pen register and trap and trace device on the SUBJECT TELEPHONE NUMBER. AT&T provided the location based services data from

July 7, 2017 through August 5, 2017. Pen register and trap and trace data was provided by

AT&T from July 7, 2017 through September 4, 2017.

12.    On July 9 and 10, 2017, the UC arranged to purchase 28 grams of fentanyl from

WILLIAMS by contacting WILLIAMS on the SUBJECT TELEPHONE NUMBER. On July

10, 2017, the UC purchased approximately 28 grams of suspected fentanyl from WILLIAMS at a

location in Arlington, Virginia, within the Eastern District of Virginia, in exchange for $2,500 in

official government funds. The transaction was audio/video recorded. The suspected fentanyl

was subsequently analyzed by the DEA Laboratory. It weighed approximately 27.8 grams, and

it was found to contain fentanyl.

13.    On August 1, 2017, the UC arranged to purchase 50 grams of fentanyl from

WILLIAMS by contacting WILLIAMS on the SUBJECT TELEPHONE NUMBER. That same

day, the UC purchased approximately 50 grams of suspected fentanyl from WILLIAMS at a

location in Hyattsville, Maryland, in exchange for $4,500 in official government funds. The

transaction was audio/video recorded. The suspected fentanyl was subsequently analyzed by the

DEA Laboratory. It weighed approximately 52.6 grams, and it was found to contain fentanyl

and heroin. During the transaction on August 1, 2017, the UC and WILLIAMS discussed a

possible future purchase of one kilogram of fentanyl. WILLIAMS informed the UC that he gets

a kilogram for $80,000, so the UC would need to provide $40,000 if he wanted to split a

kilogram with WILLIAMS.

14.    On August 23, 2017, the UC arranged to purchase 28 grams of fentanyl from

WILLIAMS by contacting WILLIAMS on the SUBJECT TELEPHONE NUMBER. That same

day, the UC purchased approximately 28 grams of suspected fentanyl from WILLIAMS at a

location in Hyattsville, Maryland, in exchange for $2,500 in official government funds. The transaction was audio/video recorded. The suspected fentanyl was subsequently analyzed by the DEA Laboratory. It weighed approximately 29.6 grams, and it was found to contain fentanyl.

15. On September 16, 2017, WILLIAMS called the UC using the SUBJECT TELEPHONE NUMBER. During the conversation, which was recorded, WILLIAMS asked the UC about the other thing that they had spoken about. The UC understood this to mean that WILLIAMS wanted to know about the possible splitting of a kilogram for $40,000 each. The UC was non-committal on a time period, and WILLIAMS then suggested that they go halfway. The UC understood this to mean that the UC would pay $20,000 for 250 grams instead of paying $40,000 for 500 grams, as they previously discussed.

16. On September 19, 2017, the UC arranged to purchase 28 grams of fentanyl from WILLIAMS by contacting WILLIAMS on the SUBJECT TELEPHONE NUMBER. That same day, the UC purchased approximately 28 grams of suspected fentanyl from WILLIAMS at a location in Hyattsville, Maryland, in exchange for $2,500 in official government funds. The transaction was not recorded due to operator error. The suspected fentanyl weighed approximately 30.3 grams with packaging, and it was not field tested due to Agent safety concerns. The suspected fentanyl is at the DEA Laboratory pending analysis.

17. During the undercover drug purchase on September 19, 2017, WILLIAMS stated that he was ready for the next move, which the UC understood to be a reference to the 250 gram deal. On September 21, 2017, the UC spoke with WILLIAMS over the SUBJECT TELEPHONE NUMBER. During their conversation, which was recorded, WILLIAMS stated that the "white" would not be available, but the other stuff was and it was just as strong. The UC

7

understood this to mean that WILLIAMS would not be able to get fentanyl for a few months but he could get heroin and it was just as potent.

18.     The FBI is planning to conduct another controlled buy with WILLIAMS on September 28, 2017. The UC will contact WILLIAMS on September 27, 2017, and the UC will request to purchase 250 grams of suspected heroin the following day for approximately $20,000.

## CONCLUSION

19.     Based on the facts outlined above, I submit there is probable cause to believe that Donnell Leroy WILLIAMS is using the SUBJECT TELEPHONE NUMBER in connection with and to further a conspiracy to distribute fentanyl, a Schedule II controlled substance, and heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

20.     A court order authorizing location-based services will assist investigators in conducting physical surveillance of WILLIAMS around the time of controlled buys, including the controlled buy that is currently planned for September 28, 2017, which will help investigators identify co-conspirators, possible residences or stash houses, and customers.

21.     Revelation of the attempt to locate and investigate WILLIAMS through use of his identified telephone would greatly compromise this ongoing investigation. If alerted to the existence of the ongoing investigation, WILLIAMS would likely change patterns, change phones, resort to other communications media, or flee.

22.     Once law enforcement receives an order for the type of information requested herein, it is served upon the subject telephone number's provider. Once received, it is catalogued and assigned to an electronic surveillance representative, who, based on caseload, will

"provision" the subject telephone number for delivery in the appropriate "switches," thereby instructing those switches to forward the information to the provider's central collection point. "Provisioning" can occur at any time and, except for exigent cases, is dictated solely by the provider. Thus, the FBI cannot control whether the order will be electronically implemented during day or night.

23.     I believe that monitoring the transmissions from the SUBJECT TELEPHONE NUMBER, which (1) includes any time of the day or night as required; (2) is expressly limited to transmissions needed to ascertain the physical location of the SUBJECT TELEPHONE NUMBER; and (3) expressly excludes any voice communications transmitted from AT&T Corporation cellular service, will provide investigating agents the ability to conduct effective surveillance of WILLIAMS, identify his customers, identify possible residences and stash locations, and identify other co-conspirators, without compromising the ongoing investigation.

Donald August Mockenhaupt
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 26th day of September, 2017.

_____/s/_____
John F. Anderson
United States Magistrate Judge
The Honorable John F. Anderson
United States Magistrate Judge
Eastern District of Virginia

9

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

SEP 2 6 2017

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION | ) |
| OF THE UNITED STATES OF AMERICA | ) |
| FOR A SEARCH WARRANT AND ORDERS | )  <u>(Under Seal)</u> |
| PURSUANT TO 18 U.S.C. §§ 2703(c)(1)(A) | ) |
| AND 3122(a)(1) FOR THE 1) DISCLOSURE | )  1:17-ec-1804 |
| OF LOCATION BASED SERVICES, | )  1:17-sw-618 |
| 2) DISCLOSURE OF STORED | ) |
| TELECOMMUNICATIONS RECORDS FOR | ) |
| TELEPHONE NUMBER **(202) 304-4414** | ) |
| AND 3) INSTALLATION OF A PEN | ) |
| REGISTER AND TRAP AND TRACE DEVICE | ) |

APPLICATION IN SUPPORT OF
A  SEARCH WARRANT AND ORDER UNDER 18 U.S.C. § 2703(c)(1)(A)
<u>AND AN ORDER UNDER 18 U.S.C. § 3122(a)(1)</u>

The United States of America, through its attorneys, Dana Boente, United States

Attorney, and J. Tyler McGaughey, Assistant United States Attorney, hereby moves this Court

pursuant to 18 U.S.C. § 2703(c)(1)(A) for a Search Warrant and Order authorizing the disclosure

of stored wire and electronic transactional records, as well as prospective location-based

electronic communications data, based on probable cause.  Furthermore, the United States, to

effectuate the prospective disclosure of location-based data, also hereby moves the Court,

pursuant to 18 U.S.C. § 3122(a)(1), for a separate Order authorizing the installation and use of a

pen register and trap and trace device.

This application concerns the telephone number **(202) 304-4414** (hereinafter "SUBJECT

TELEPHONE NUMBER"), which is serviced by AT&T.  This phone number is believed to be

1

used by Donnell Leroy WILLIAMS, a suspected fentanyl/heroin distributor. **This is the second application the government has submitted for prospective location-based electronic communications data for the SUBJECT TELEPHONE NUMBER. On July 7, 2017, the Honorable Theresa Carroll Buchanan, U.S. Magistrate Judge for the Eastern District of Virginia, signed a Warrant and Orders authorizing the disclosure of prospective location-based electronic communications data for the SUBJECT TELEPHONE NUMBER for a period of thirty days. The government acquired location information for the SUBJECT TELEPHONE NUMBER from on or about July 7, 2017, to on or about August 5, 2017. On August 7, 2017, Judge Buchanan signed an Order granting the government's request to delay notification of the acquisition of location information for the SUBJECT TELEPHONE NUMBER until November 6, 2017.**

In support of this application, the undersigned states as follows:

1.     The undersigned is an attorney for the government as defined by Rule 1(b) of the Federal Rules of Criminal Procedure and, therefore, may apply for an order authorizing the installation and use of a pen register and a trap and trace device under 18 U.S.C. § 3122(a)(1) and the disclosure of location-based electronic communications data and telecommunications records under 18 U.S.C. § 2703(c)(1)(A).

2.     Pursuant to 18 U.S.C. § 3122(a)(1), Applicant certifies that the Federal Bureau of Investigation (FBI) is conducting a criminal investigation involving a conspiracy to distribute controlled substances in the Eastern District of Virginia and elsewhere and the investigation continues in connection with possible criminal violations, including, among others, 21 U.S.C. §§ 841(a)(1) and 846; that it is believed that a subject of the investigation has used a cellular device

assigned the SUBJECT TELEPHONE NUMBER; that the provider for the SUBJECT

TELEPHONE NUMBER is AT&T; and that information likely to be obtained from the pen

register and trap and trace device is relevant and material to an ongoing investigation.

Specifically, it is believed that this information will help to reveal the location of the target and

the extent and manner of the target's criminal activity.

3.     The attached affidavit of Donald August Mockenhaupt, FBI Special Agent, is

submitted to establish probable cause for a Search Warrant and Order to disclose prospective

location-based data as well as transactional and stored records for the cellular device assigned the

SUBJECT TELEPHONE NUMBER under the evidentiary standard articulated by Federal Rule

of Criminal Procedure 41(d)(1) and pursuant to 18 U.S.C. § 2703(c)(1)(A).

*REQUEST FOR DISCLOSURE OF LOCATION-BASED DATA*

4.     Pursuant to 18 U.S.C. § 2703(c)(1)(A) and consistent with the probable cause

evidentiary standard articulated by Federal Rule of Criminal Procedure 41, Applicant requests

the Court issue a Search Warrant and Order authorizing the United States (including but not

limited to the agents of the FBI) to require AT&T to disclose prospective location-based data

that will assist law enforcement in determining the location of the cellular device assigned the

SUBJECT TELEPHONE NUMBER (differentiated from the last cell-site used to make or

receive a call, which simply identifies the location of the third-party provider's infrastructure).

This application for location-based data includes the request for a Warrant and Order directing

AT&T to employ and to disclose the results (through any means reasonably available) of all

available location-based services, including, but not limited to, any of the following: real Global

Positioning System ("G.P.S.") or any geo-location coordinates associated with this cellular

device; precision location information; real time cell-site data; and "Enhanced-911" services developed by AT&T in order to comply with the provisions of 47 C.F.R. § 20.18.

*TRANSACTIONAL AND STORED RECORDS REQUEST*

5.     The attached affidavit of Donald August Mockenhaupt, FBI Special Agent, sets forth probable cause to believe that transactional and stored records in the possession of AT&T are evidence related to a crime. Applicant requests the Court issue an Order directing AT&T to disclose or provide the following information and records associated with the SUBJECT TELEPHONE NUMBER to the FBI and the United States Attorney's Office for the sixty (60) days preceding the date of the Order up to the present:

a.     Subscriber records, Mobile Directory Number ("MDN")[1] or Mobile Identification Number ("MIN")/Mobile Subscriber Identity ("MSID"), Electronic Serial Number ("ESN"), International Mobile Subscriber Identity ("IMSI"), and billing information;

b.     Historical call-detail records of the numbers dialed, (including any two-way radio features, if available), the duration of the call, the incoming

---

[1] The following definitions are hereby incorporated throughout this application and proposed order. Mobile Directory Number ("MDN") is the number by which a subscriber and those calling a subscriber know a telephone number. Mobile Identification Number ("MIN"), also known as Mobile Subscriber Identity ("MSID"), is a 10-digit routing number through which telecommunications providers route calls. The MIN/MSID is frequently the same as the MDN; its use was brought about by the local number portability laws that allow customers to take their phone numbers to another provider. Thus, a MIN/MSID will always be a 10-digit phone number that was originally licensed to a telecommunications provider and will never be the same as the MDN *if* a subscriber "ported" their number away from its original licensee. International Mobile Subscriber Identity ("IMSI") is a unique number that is associated with all GSM and UMTS cellular users. International Mobile Equipment Identity ("IMEI") is a unique number given to every single cellular device. Electronic Serial Number ("ESN") is a unique number that every cellular device has and is assigned by the manufacturer.

4

telephone numbers (if available), and the cell-site (and sector if available) used by

the device at the beginning and/or end of a call;

c.      Historical cell-site information or cell-site data[2] (including any two-way

radio feature mode), consisting of data associated with registration of the cellular

phone with the tower location through which the cellular telephone connects to

the provider's physical communications network, which is typically captured at

both the beginning and end of a call (but not in-between) and at power-up or

power-down.  The cell-site information or data explicitly includes cell-site tower

information for calls to or from the SUBJECT TELEPHONE NUMBER.

d.      An engineering map, showing all cell-site tower locations/addresses,

sectors, and orientations;

e.      A list of control channels/radio channels and their corresponding cell sites;

f.      Any and all changes (including additions, deletions, and transfers) in

service regarding the device, including changed telephone numbers (MDN or

MIN/MSID), network addresses (IMSI, IP and UFMI), equipment changes (*e.g.*,

---

[2] "Cell-site data" is the means by which law enforcement determines, based on records maintained, captured, and recorded by providers in the ordinary course of business, the first or last physical location through which a call or connection enters or leaves a telecommunications provider's infrastructure and is routed through the Public Switched Telephone Network; thus, this information is akin to determining where landline wires terminate in providing wired phone service to a specific subscriber.  A cell-site is located in a geographic area within which wireless service is supported through radio signaling to and from antenna tower(s) operated by a provider. Mobile phones that are powered on/off or change switching offices will register or deregister their availability with the network.  The registration process is the technical means by which the network identifies the subscriber, validates the account and determines where to route call traffic. This exchange normally occurs on a dedicated "control channel" that is clearly separate from call content (voice and data), which occurs on a dedicated "voice channel." .

ESN, IMEI and SIM) and subscriber information changes (published, non-published, listed, or unlisted); and

g.      Call detail report for data communications.

6.      This Application does not seek any content of any wire or electronic communications. It also does not seek any post-cut-through dialed digits.

*PEN REGISTER/TRAP & TRACE DEVICE REQUEST*

7.      Pursuant to 18 U.S.C. §§ 3122(a)(1) and 3123(a)(1), Applicant requests the Court issue an Order authorizing the installation and use of a pen register and trap and trace device (hereinafter "pen/trap device"). The term "pen register," as defined at 18 U.S.C. § 3127(3), as amended, is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." A "trap and trace device," defined at 18 U.S.C. § 3127(4), as amended, is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication."

8.      In accordance with 18 U.S.C. § 3121(c), Applicant has informed the FBI that it shall use reasonably available technology to restrict the recording or decoding of electronic or other impulses to the dialing, routing, addressing and signaling information[3] utilized in the processing and transmitting of wire or electronic communications so as not to include the

---

[3] For both the pen register and trap and trace device, this request explicitly includes dialing, routing, addressing, or signaling information transmitted over the communication service provider's network by a two-way radio feature (including, but not limited to, Nextel's "Direct Connect/Direct Dispatch," Verizon's "Push to Talk," AT&T's "ReadyLink," or any other comparable service, irrespective of trade-name).

6

contents of any wire or electronic communication. Accordingly, this application does not seek authority to intercept the contents of any wire or electronic communication.[4]

9.      Based upon the above certification and pursuant to 18 U.S.C. §§ 3122(a)(1) and 3123(a)(1), Applicant hereby requests that the Court issue an Order authorizing the installation and use of a pen register to record or to decode dialing, routing, addressing, or signaling information from the SUBJECT TELEPHONE NUMBER, to record the date and time of such dialings or transmissions, and to record the length of time the telephone receiver in question is "off the hook" for incoming or outgoing calls, without geographic limits, for a period of sixty (60) days from the date of the Order or the date the monitoring equipment becomes operational, whichever occurs later.

10.      Applicant further requests that the Court issue an Order, pursuant to 18 U.S.C. §§ 3122(a)(1) and 3123(a)(1), authorizing the installation and use of a trap and trace device and the activation of the CALEA Delivery System on the SUBJECT TELEPHONE NUMBER to capture and record the incoming electronic or other impulses which identify the originating numbers or other dialing, routing, addressing, or signaling information reasonably likely to identify the sources of wire or electronic communications and to record the date, time and duration of calls created by such incoming impulses, without geographic limits, for a period of sixty (60) days from the date of the Order or the date the monitoring equipment becomes operational, whichever occurs later.

---

[4] This application explicitly does not seek any post-cut-through dialed digits, and technical personnel will be instructed not to record such information.

7

*ADDITIONAL REQUESTS*

11.     Applicant further requests, pursuant to 18 U.S.C. § 3123(b)(1)(C), that the Order

authorize the installation and use of the requested pen/trap device on any changed telephone

number(s) subsequently assigned to a cellular device bearing the same IMSI, MIN, IMEI, MSID

or ESN as the one initially associated with the SUBJECT TELEPHONE NUMBER, or any

changed IMSI, MIN, IMEI, MSID or ESN subsequently assigned to the same cellular device, or

any additional changed telephone number(s) and/or IMSI, MIN, IMEI, MSID or ESN, whether

the changes occur consecutively or simultaneously, listed to the same subscriber, wireless

account, or cellular device.

12.     Applicant further requests an Order direct AT&T to notify agents of the FBI,

upon oral or written request, of any and all changes (including additions, deletions, and transfers)

in service regarding the SUBJECT TELEPHONE NUMBER to include telephone numbers and

subscriber information (published and non-published) associated with these service changes.

13.     Pursuant to 18 U.S.C. § 3124, Applicant requests further that AT&T, all other

providers of wire or electronic communication service, or other persons furnish information,

facilities, and technical assistance necessary to accomplish the installation and use of the pen/trap

device and other requirements of the Court's Warrant and Orders unobtrusively, with reasonable

compensation to be paid by the FBI for reasonable expenses incurred in providing such facilities

and assistance.  Applicant further specifically requests that AT&T and any other

telecommunications providers subject to the Warrant and Orders be directed to provide

twenty-four (24) hour a day switch-based engineering and technical assistance and shall notify

the FBI prior to terminating or restricting service to SUBJECT TELEPHONE NUMBER for

non-payment to enable the FBI to assume financial responsibility for all services, for the duration of the Warrant and Orders.

14.    Applicant further requests that, upon request of the FBI, all records and information required to be provided pursuant to the proposed Warrant and Orders be provided in a commercially reasonable electronic format specified by the FBI; and that those records be delivered forthwith via electronic mail (unless delivery under the current CALEA delivery protocol is possible and requested) to the electronic mail address specified by the law enforcement agent serving the Warrant and Orders.

15.    Applicant requests that the proposed Warrant and Orders, upon service, shall apply to any person or entity providing wire or electronic communication service in the United States whose assistance may facilitate its execution (including any internet service provider or other electronic communications provider providing voice-over-Internet Protocol telephony); and that whenever served on any person or entity not specifically named therein, upon request of such person or entity, the attorney for the Government or law enforcement or investigative officer that is serving the Warrant and Orders shall provide written or electronic certification, under 18 U.S.C. § 3123(a)(1), that the Warrant and Orders apply to the person or entity being served.

16.    Pursuant to 18 U.S.C. § 3123(c), Applicant requests that the proposed Order for a pen register and trap and trace device be effective in all respects for the sixty (60) days following its execution or the time that the equipment becomes operational, whichever is later.  Pursuant to 18 U.S.C. § 2703(c)(1)(A), Applicant requests that the proposed Warrant and Order for prospective location-based services allow for the disclosure for thirty (30) days following its

9

execution or the date that the monitoring equipment for the device's location becomes operational, whichever is later, and also for transactional and stored records in the possession of AT&T for the sixty (60) days prior to the date of the Warrant and Order.

17.     The Applicant also respectfully requests pursuant to 18 U.S.C. §§ 2705(b) and 3123(d) that this application, the Warrant, the Orders, and affidavit in support be filed under seal until unsealed by the Court, and that AT&T and any other telecommunications providers subject to the Warrant and Orders be directed not to disclose the existence of this investigation, Warrant, and Orders for a period of two years from the date of the Warrant and Orders.  Based on the information provided in support of this application, there is reason to believe that disclosure of the requested Warrant and Orders may seriously jeopardize the investigation in that the parties currently using the SUBJECT TELEPHONE NUMBER will cease to use the SUBJECT TELEPHONE NUMBER to conduct their illegal activities and may destroy evidence of past activities.  Notwithstanding this request, the Applicant asks that copies of the Warrant and Orders be furnished to the FBI, the United States Attorney's Office, AT&T, and any other telecommunications providers subject to the Warrant and Orders.

18.     WHEREFORE, it is respectfully requested that the Court issue a Search Warrant and Order pursuant to 18 U.S.C. § 2703(c)(1)(A), for location-based services associated with the SUBJECT TELEPHONE NUMBER for a period of thirty (30) days from the date of the Warrant or the date the monitoring equipment for the device's location becomes operational, whichever occurs later, and also for transactional and stored records in the possession of AT&T for the sixty (60) days prior to the date of the Warrant and Order.

19.     FURTHERMORE, it is requested that the Court issue an Order pursuant to 18

U.S.C. § 3122(a)(1): (1) that authorizes the installation and use of a pen register to record or to

decode dialing, routing, addressing, or signaling information from the SUBJECT TELEPHONE

NUMBER, record the date and time of such dialings or transmissions, and to record the length of

time the telephone receiver in question is "off the hook" for incoming or outgoing calls, without

geographic limits, for a period of sixty (60) days from the date of the Order or the date the

monitoring equipment becomes operational, whichever occurs later; (2) that authorizes the

installation and use of a trap and trace device and activation of the CALEA Delivery System on

the SUBJECT TELEPHONE NUMBER to capture and record the incoming electronic or other

impulses which identify the originating numbers or other dialing, routing, addressing, or

signaling information reasonably likely to identify the sources of wire or electronic

communications and to record the date, time and duration of calls created by such incoming

impulses, without geographic limits, for a period of sixty (60) days from the date of the Order or

the date the monitoring equipment becomes operational, whichever occurs later; (3) that

authorizes the installation and use of the requested pen/trap device on any changed telephone

number(s) subsequently assigned to a cellular device bearing the same IMSI, MIN, IMEI, MSID

or ESN as the one initially associated with the SUBJECT TELEPHONE NUMBER, or any

changed IMSI, MIN, IMEI, MSID or ESN subsequently assigned to the same cellular device, or

any additional changed telephone number(s) and/or IMSI, MIN, IMEI, MSID or ESN, whether

the changes occur consecutively or simultaneously, listed to the same subscriber, wireless

account, or cellular device; (4) that directs AT&T to notify agents of the FBI, upon oral or

written request, of any and all changes (including additions, deletions, and transfers) in service

regarding the SUBJECT TELEPHONE NUMBER to include telephone numbers and subscriber

information (published and non-published) associated with these service changes; (5) that directs

AT&T, any other telecommunications providers, or any other persons subject to the Warrant and

Orders to furnish information, facilities, and technical assistance necessary to accomplish the

installation and use of the pen/trap device and other requirements of the Orders and Warrant

unobtrusively, with reasonable compensation to be paid by the FBI for reasonable expenses

incurred in providing such facilities and assistance; (6) that requires that AT&T and any other

telecommunications provider subject to the Warrant and Orders provide twenty-four (24) hour a

day switch-based engineering and technical assistance and notify the FBI prior to terminating or

restricting service to SUBJECT TELEPHONE NUMBER for non-payment to enable the FBI to

assume financial responsibility for all services, for the duration of the Warrant and Orders; (7)

that directs that all records and information provided pursuant to the proposed Warrant and

Orders be provided in a commercially reasonable electronic format specified by the FBI and that

those records be delivered forthwith via electronic mail (unless delivery under the current

CALEA delivery protocol is possible and requested) to the electronic mail address specified by

the law enforcement agent serving the Warrant and Orders; (8) that directs that the proposed

Warrant and Orders, upon service, shall apply to any person or entity providing wire or

electronic communication service in the United States whose assistance may facilitate its

execution (including any internet service provider or other electronic communications provider

providing voice-over-Internet Protocol telephony) and that whenever served on any person or

entity not specifically named therein, upon request of such person or entity, the attorney for the

Government or law enforcement or investigative officer that is serving the Warrant and Orders

shall provide written or electronic certification, under 18 U.S.C. § 3123(a)(1), that the Warrant

and Orders applies to the person or entity being served; (9) that places the Warrant, the Orders, this application, and the affidavit in support under seal until otherwise ordered by the Court; (10) that allows copies of such Warrant and Orders to be furnished to the FBI, the United States Attorney's Office, AT&T, and any other telecommunications providers subject to the Warrant and Orders; and (11) that requires that AT&T, any other telecommunications providers subject to the Warrant and Orders, their agents, and their employees not disclose the existence of the pen/trap device, the Proposed Warrant or Orders, or the existence of the investigation to any person, except as necessary to effectuate the Warrant and Orders, for a period of two years from the date of the Warrant and Orders.

The foregoing is based on information provided to me in my official capacity by agents of the FBI.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief, and that this declaration was executed on this 26th day of September, 2017.

J. Tyler McGaughey
Assistant United States Attorney